E-FILED
Monday, 27 September, 2010 01:06:22 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS - SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JEFFREY L. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-3193 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION</u>

CHARLES H. EVANS, U.S. Magistrate Judge:

Plaintiff Jeffrey L. Brown appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively Disability Benefits). 42 U.S.C. §§ 416(I), 423, 1382c. The parties consented, pursuant to 28 U.S.C. § 636©, to have this matter proceed before this Court. <u>Consent to Proceed Before a United States Magistrate Judge, and Order of Reference (d/e 9)</u>. This appeal is brought pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the decision of the Defendant Commissioner of Social Security is affirmed.

## STATEMENT OF FACTS

Brown was born on November 29, 1958. He completed the eleventh grade in school. Answer (d/e 11), attached Certified Transcript of Record of Proceedings ®.), at 60, 148. Brown previously worked as a construction worker and carpet layer. R. 145, 150, 183. On June 6, 2005, Brown went to the emergency room at Memorial Medical Center in Springfield, Illinois (Memorial), for treatment for a fractured rib as a result of a fall. R. 216-17, 225. On June 16, 2005, he went to see David D. Newton, M.D., for continued pain in his ribs after the fall. Dr. Newton told Brown to remain off work. R. 240. Dr. Newton released Brown to work on July 5, 2005. R. 238.

On August 3, 2005, Brown went to Memorial for headache, lack of coordination, unsteady gait, nausea, dizziness, weakness, and cognitive and behavioral changes. A head CT scan identified a subacute cerebellar infarct, indicating that Brown had suffered a stroke. Brown was diagnosed with a cerebrovascular accident and hypertension. The doctors prescribed Toprol-XL, Plavix, and aspirin. R. 202, 205-06, 208, 210-12.

Brown went to see Dr. Newton on August 15, 2005. Brown reported

that he had a few spills since the stroke, and had not yet regained his balance. Brown reported an episode four days earlier when he woke up with a headache and severe dizziness. R. 235-37. Upon examination, Dr. Newton observed that Brown had difficulty tandem walking, difficulty turning around rapidly as he walked, and a positive Romberg sign. R. 234-237. A positive Romberg sign means that a person loses his sense of balance when he stands with his feet together and his eyes closed. Stedman's Medical Dictionary (28th ed. 2006), at 1771.

Brown filed his application for disability benefits on October 18, 2005. He alleged that his onset date was June 6, 2005. He alleged that he was disabled due to the residual effects of cerebrovascular disease, essential hypertension, and stroke. R. 14, 60, 120-26.

On December 14, 2005, Brown was examined by Vittal V. Chapa, M.D., at the Commissioner's request. R. 244-50. Brown reported dizziness, loss of balance, and double vision. He also reported having headaches two or three times a week, lasting up to ten hours with nausea and vomiting. Upon examination, Dr. Chapa observed that Brown had a broad-based, ataxic gait, was unable to walk on his toes or heels, and could not perform tandem walking. R. 245-46. Dr. Chapa also observed a

positive Romberg sign.  Dr. Chapa found good hand grip bilaterally and the ability to perform fine and gross manipulations.  Dr. Chapa diagnosed Brown with post cerebrovascular accident and hypertension.  R. 246.

On December 22, 2005, state agency physician Charles Kenney, M.D., prepared a Residual Functional Capacity assessment.  Dr. Kenney opined that Brown could perform light work with occasional use of ladders, ropes, and scaffolds, and with no concentrated exposure to hazards.  R. 251-55. Dr. Kenney noted that there was no examining or treating physician source in the file.  R. 257.

Brown contacted Dr. Newton again on June 31, 2006.[1]  Brown told Dr. Newton that he could not tolerate heat and humidity.  R. 261.  On July 28, 2006, Brown went to Memorial's Rural Health Center.  R. 262-63. Brown complained of migraine headaches triggered by heat and reading. Brown stated that he never had migraines before he suffered the stroke.  He stated that the last migraine involved photophobia and nausea.  R. 262. Brown was prescribed Tramodol.  R. 263.

The Administrative Law Judge (ALJ) conducted an evidentiary hearing

---

[1]The only document in the record is a handwritten note on a prescription slip apparently signed by Dr. Newton.  R. 261.  There is no treatment note or other record of any contact between Brown and Dr. Newton.

4

on September 3, 2008.  R. 25-59.  Brown was represented by counsel at the hearing.  Brown and his daughter Amanda Brown testified, as well as vocational expert Ronald Malik.  R. 26; see R. 96.  Brown initially testified that he believed he had a stroke when he fell on June 6, 2005.  R. 30.  He was working for a bricklayer at the time.  Brown testified that he performed construction work on and off since he was 16 years old.  R. 30.  Brown later agreed that the stroke occurred in August 2005.  R. 37.

Brown testified that at the time of the hearing he was working at a grain elevator.  He worked from 7:30 a.m. to 4:30 p.m. five days a week, although the employer sometime sent him home if there was no work to do.  He was still paid for the full day even if he was sent home.  R. 30.  Brown described his work as follows, "I, basically I tell a truck when to stop and I push a button."  R. 30.  The truck then unloads grain into the correct bin.  R. 40.  The trucks came anywhere from once an hour to five times an hour.  R. 47.  He was paid $10.50 per hour. Brown testified that he worked at the elevator during the harvest for the last three years.  R. 30-31.  He testified that he usually worked from the last week in August until the first week in October.  R. 31.  He testified at the hearing that he started working this year at the end of July 2008.  R. 38.

5

Brown testified that he was related to everyone who worked at the elevator. He said that "they pretty much cover my butt on stuff I'm supposed to do and stuff I can't do." R. 39. Brown testified, that, for example, he was supposed to clean out the bins, but his relatives did that for him. He said that he is allowed to lie down on a cot at the elevator as needed. R. 40. He testified that he could not keep the job if his relatives did not cover for him. R. 41.

Brown testified that he broke his ribs when he fell off a scaffold. Brown also testified that he suffered from glaucoma and double vision. The double vision was corrected with glasses. R. 31.

Brown testified that he still suffered from problems as a result of the stroke in 2005. He stated that he had no balance and no hand-to-eye coordination. He also said, "Whenever I get a little bit hot from the heat, I'll get, I'll get sick, and I'll lose, lose my balance from that. Just all kinds of problems." R. 31. Brown testified that he did not go to see the doctor anymore because he had no insurance and he owed the doctor too much money. R. 37-38.

The ALJ asked Brown if he had any other problems. Brown testified that his back hurt from falling down regularly due to a lack of balance. R.

32. Brown also stated that his knees hurt from injuries he suffered growing up on a farm. R. 32.

Brown testified that he could walk 200 yards, depending on the heat. R. 33. Brown testified that in a typical day he got up at 5:00 a.m., watched the news until 6:00 a.m., got dressed, and went to work. His cousin drove him to work. Brown lost his driver's license ten years earlier due to a DUI conviction. R. 34.

Brown lived with his little brother in a house. His little brother did the yard work and laundry. His daughter did his housecleaning. Brown's little brother and his sister-in-law did the cooking. The sister-in-law lived next door with another brother of Brown. Brown testified that he did not have any hobbies and did not go to church, belong to clubs, or visit friends. He used to fish, but quit because he fell into the pond. R. 34-37.

On examination by his attorney, Brown discussed additional problems that he continued to suffer as a result of the stroke. His long-term and short-term memory had suffered. He had lost his strength. He said that his back "went out" when he picked up as little as four pounds. R. 42. He testified that he could not sit for an hour and that sitting for thirty minutes "would be pushing it." R. 42. He said that he could stand for about twenty

minutes.  R. 42.  Brown said that he got migraine headaches a couple of times a week.  The headaches lasted six to eight hours.  When he got a headache, he had to lie down in a dark, silent room.  R. 44.  He testified that he missed work at the elevator once a week because of the headaches.  R. 44.

Brown testified that when he was not working at the grain elevator, he woke up between 2:00 a.m. and 4:00 a.m., and eventually went back to sleep until some time between 10:00 a.m. and 12:00 p.m.  He said that pain, cramps, and muscle spasms kept him up during the night.  R. 43.

Brown testified that he had double vision that was corrected with glasses.  He testified that he recently was prescribed bifocals.  He experienced migraine headaches when he reads with the bifocals.  R. 43.

Vocational expert Malik then testified.  The ALJ asked Malik the following question:

> I want you to assume a person the same age, education and work experience as the claimant.  And assume this person can perform a full range of light, but he's not to be – he's not going to use ropes, ladders or scaffold.  And such a person will also need to avoid concentrated exposure to hazardous, such as heights and machinery. As well as exposure to extreme heat and cold.  And, and that such a person would also be limited to simple one and two step tasks.  Would this person be able to perform any of the claimant's prior relevant work?

8

R. 49.  Malik replied, "No.  And given the job he wouldn't."  R. 49.  Malik also said that the hypothetical person would not be able to perform Brown's current job at the grain elevator.  Malik stated that the job was medium, semiskilled work.  R. 49-50.

Malik, however, testified that the person could perform several other jobs, including assembly press operator, production assembler, product assembler, marker or labeler, and tuning bender.  Malik stated the reference number for each job in the Department of Labor's <u>Dictionary of Occupational Titles (DOT)</u>.  Malik stated that these jobs were representative of light, unskilled jobs that the person could perform.  R. 49.

On examination by Brown's attorney, the expert stated that the hypothetical person would not be employable if his balance and memory problems did not allow him to reach the level of "80 percent productive."  R. 50.  The expert stated that the person could not work if he missed work three days a month, or if he needed thirty-minute breaks every hour.  R. 50-51.

Amanda Brown then testified.  She was Brown's daughter.  She testified about his condition immediately after the stroke in August 2005 and about his memory problems and balance problems.  She also testified

9

that he has gotten somewhat better over time.  R. 54-57.

At the end of the hearing, the ALJ agreed to leave the record open to allow Brown to submit additional medical evidence.  Brown thereafter submitted a form entitled Stroke Residual Functional Capacity Questionnaire dated October 15, 2008, that was filled out and signed by Dr. Newton.  R. 266-71.  Dr. Newton checked the boxes on the form indicating that Brown had the following symptoms: balance problems, poor coordination, loss of manual dexterity, weakness, unstable walking, falling spells, numbness and tingling, pain, fatigue, bladder problems (frequency), nausea when overheated, vertigo/dizziness, headaches, difficulty remembering, confusion, depression, personality change, problems with judgment, and double or blurred vision/partial or complete blindness.  R. 266.

Dr. Newton checked the following answers to following questions: "No" to the question, "Is your patient a malingerer?"; "Yes" to the question, "Does your patient have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station?"; and "Yes" to the question, "Do emotional factors contribute to the severity of your patient's symptoms and

functional limitations?" R. 267.

Dr. Newton opined that Brown frequently suffered from pain, fatigue or other symptoms severe enough to interfere with attention and concentration. Dr. Newton answered, "None" to the question, "How many city blocks can your patient walk without rest?" R. 267. Dr. Newton opined that Brown could sit for twenty minutes at a time and less than two hours total in an eight-hour workday, stand for two minutes at a time, would need to take eight unscheduled twenty-minute breaks in an eight-hour day, and would need to elevate his legs fifty percent of the time during an eight-hour workday. Dr. Newton opined that Brown would need to be absent from work about four days a month. R. 267-71.

The ALJ issued his decision on December 12, 2008. R. 14-23. The ALJ followed the five-step analysis set forth in the Social Security Administration regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520©, 416.920©. If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and

11

work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). Such severe impairments are set forth in the Listings. 20 C.F.R. Part 404 Subpart P, Appendix 1. The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering his residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Brown met his burden at Steps 1 and 2. He was not engaged in substantial gainful activity and he had severe impairments. The ALJ determined that Brown's seasonal work at the grain elevator was

not enough to constitute substantial gainful activity. The ALJ further found that Brown suffered from the impairments of hypertension and status post cerebrovascular accident. The ALJ found that the headaches, rib injury, back pain, knee pain, and eye problems were not severe impairments. The ALJ determined that the glaucoma did not affect his ability to work and his double vision was corrected with glasses. The ALJ found no objective medical evidence to support the other claims. The ALJ also noted that Brown did not mention the headaches on direct examination. The ALJ, however, stated that he could consider the back pain in conjunction with the other severe impairments that he found. R. 16-17.

At Step 3, the ALJ found that Brown did not meet a Listing. The ALJ considered Listing 11.04 for central nervous system vascular accidents. Listing 11.04 requires a documented vascular accident affecting the central nervous system and one or more of the following more than three months post vascular accident:

    A.    Sensory or motor aphasia resulting in ineffective speech or communications; or

    B.    Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.

13

20 C.F.R. § 404, Subpart P, Appendix 1, Listing 11.04. The ALJ found that neither of these conditions was present. R. 17-18.

At Step 4, the ALJ found that Brown had the RFC to perform light work subject to the following additional restrictions: no climbing of ladders, ropes, or scaffolds; no exposure to hazards or extreme heat or cold; and limited to simple one-two step tasks. R. 18. The ALJ based this finding on Dr. Kenney's RFC assessment, Amanda Brown's testimony that her father has gotten better over time, and Brown's testimony that he was working seasonally at a grain elevator. The ALJ found that Brown's testimony about the severity of his symptoms was not credible.

The ALJ discounted Dr. Newton's October 15, 2008 opinions because Dr. Newton did not reference any medical records to support his opinions, his opinions that Brown could only stand for two minutes and could not walk a block were inconsistent with Brown's own testimony and the evidence that Brown worked nine hours a day during harvest. R. 20-21. The ALJ also noted that Brown had not received treatment from Dr. Newton since October 25, 2005, almost three years before he gave the opinions in October 2008. R. 20-21.

The ALJ concluded at Step 4 that Brown could not perform his past

14

relevant work. At Step 5, the ALJ found that Brown could perform a significant number of jobs in the national economy. R. 22. The ALJ relied on the testimony of vocational expert Malik and the Medical-Vocational Guidelines. R. 22; 20 C.F.R. Part 404, Subpart P, Appendix 2. The ALJ determined that the expert's opinions were consistent with the information in the DOT. R. 22. The ALJ, therefore, concluded that Brown was not disabled.

Brown appealed to the Appeals Council. The Appeals Council denied review on July 2, 2009. R. 1-4. Brown then brought this action for judicial review.

ANALYSIS

This Court reviews the ALJ's decision to determine whether it is supported by substantial evidence. Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ further must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d

15

329, 333 (7th Cir. 1994). The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's opinion is supported by substantial evidence. Dr. Kenney's evaluation supports the ALJ's RFC findings that Brown could perform light work with the restrictions noted. Brown's testimony that he worked nine hours a day at a seasonal job for three years also supports this conclusion. Malik's testimony supports the ALJ's conclusion that Brown can perform a substantial number of jobs in the national economy. Thus, substantial evidence in record supports the ALJ's determination at Step 5 that Brown was not disabled.

Brown raises a number of issues on appeal. Brown argues first that the ALJ erred in finding that his headaches were a non severe impairment. This is essentially a credibility question. The ALJ found Brown's headaches to be non severe because Brown did not list headaches as an impairment in response to the ALJ's questions, but later, in response to his attorney's questions testified that he suffered from headaches twice a week that force him to sit in a dark, silent room for six to eight hours. The ALJ found the testimony inconsistent and found that Brown's claims as to the severity of

the headaches was not credible.  R. 17.  The Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ's explanation is supported by the record and will not be disturbed.

Brown next argues that the ALJ erred at Step 3 in concluding that Brown did not meet Listing 11.04.  Brown argues that his condition met subsection B three months after the August 2005 stroke.  Brown argues that he had persistent disorganization of motor function that resulted in a sustained disturbance of his gait and station.  Dr. Chapa's December 2005 examination is the only examination in the record that was performed more than three months after the stroke.  Dr. Chapa observed a broad-based, ataxic gait, an inability to walk on his toes or heels or to perform tandem walking, a positive Romberg sign, and an abnormal heel-to-shin test.  R. 245-46.  The ALJ concluded that this evidence did not establish a persistent disorganization of motor function.  R. 17.  A reasonable man could agree with the ALJ's assessment of the evidence.  Richardson, 402 U.S. at 401.  The Court, therefore, will not overturn the ALJ's conclusion on this point.

Brown next argues that the ALJ erred in rejecting Dr. Newton's

October 2008 opinions. A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. In this case, Dr. Newton's 2008 opinions are inconsistent with substantial evidence in the record. The ALJ pointed out the inconsistencies between Dr. Newton's opinions and Brown's testimony. R. 20-21. The ALJ also pointed out that Dr. Newton had not treated Brown in almost three years.[2] The ALJ's decision not to give Dr. Newton's opinions controlling weight is supported by substantial evidence.

Brown also complains that the ALJ's finding that Brown was limited to simple one or two-step tasks was not supported by the record. The Court disagrees. Brown testified that he performed a simple one or two-step job, "I, basically I tell a truck when to stop and I push a button." R. 30. Brown's own words support the ALJ's conclusion that he can perform such tasks.

Brown next argues that the ALJ erred in his credibility determinations.

---

[2]Brown contacted Dr. Newton in 2006, but there is no record of any examination or treatment at that time. R. 261.

The Court, again, will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder, 529 F.3d at 413-14. The ALJ's credibility determinations are supported by the record. The Court will not disturb them.

Last, Brown argues that ALJ erred because he failed to question Malik regarding inconsistencies between his testimony and the definitions in the DOT. An ALJ must obtain an explanation from a vocational expert when there is an apparent conflict between the expert's testimony and the definitions in the DOT. SSR 00-4p. In this case, the ALJ limited Brown to jobs that involved simple one or two step instructions, but Brown argues that Malik listed jobs that required more training than simple or two step instructions according to the DOT. Plaintiff's Social Security Memorandum in Support of Reversal or Remand (d/e 13), at 16-17, and material cited therein. Brown argues that the case must be remanded to resolve this conflict.

The Court disagrees. Brown did not raise the inconsistencies at the hearing. He, therefore, must show that the conflict between Malik's testimony and the DOT was "obvious enough that the ALJ should have picked up on [it] without any assistance." Terry v. Astrue, 580 F.3d 471,

19

478 (7th Cir. 2009) (quoting <u>Overman v. Astrue</u>, 546 F.3d 456, 462-63 (7th Cir. 2008). Brown has failed to make this showing. He, therefore, fails to show that the ALJ erred in not asking Malik about these inconsistencies.

THEREFORE, the Defendant Commissioner's Motion for Summary Affirmance (d/e 17) is ALLOWED. The decision of the Commissioner is affirmed. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER: September 27, 2010.

FOR THE COURT:

                              s/Charles H. Evans
                              CHARLES H. EVANS
                              United States Magistrate Judge